UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                        :
GRAFTECH INTERNATIONAL                  :
HOLDINGS, INC.,                         :
                                        :        CASE NO. 1:14-CV-02658
                  Plaintiff,            :
                                        :
vs.                                     :        OPINION & ORDER
                                        :        [Resolving Doc. 6]
SANGRAF INTERNATIONAL, INC.             :
ET AL.,                                 :
                                        :
                  Defendants.           :
                                        :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff GrafTech International Holdings, Inc. ("GrafTech") seeks a preliminary injunction forbidding Defendant SANGRAF International, Inc. ("SANGRAF") from using SANGRAF's Integraf software.  GrafTech says that SANGRAF's Integraf software violates GrafTech's copyright in GrafTech's own ArchiTech software.  On January 23, 2015, the Court held on hearing on GrafTech's motion for a preliminary injunction.  For the following reasons, the Court now **DENIES** that motion.

## I. Background

GrafTech and SANGRAF compete in the graphite electrode market.  As relevant to this case, they each sell graphite electrodes to steel manufacturers.  Steel manufacturers use these graphite electrodes in electric arc furnaces.  With use, the electrodes deteriorate and must be replaced.

Plaintiff GrafTech is the dominant player in this market, with well over half of the sales in the United States and annual sales of approximately $800 million.[1]  SANGRAF entered the industry

------------------

[1] Hr'g Tr. at 44.

Case No. 1:14-CV-02658
Gwin, J.

in 2012.  GrafTech's counsel estimates that Defendant SANGRAF makes annual sales in the "low millions."[2]

The dispute in this case is about the software that allows the companies to provide monitoring services to its graphite electrode customers.  This software allows customers to run their furnaces more efficiently, thus reducing costs.[3]  GrafTech labeled its software ArchiTech.  GrafTech offers ArchiTech free to approximately 30-40% of its customers.[4]

SANGRAF labels its software Integraf, and it plans to similarly give it to some or all of its customers.  Other than  the parties to this case, one competitor, SGL Carbon, also has comparable software.[5]

In February 2013, Plaintiff GrafTech laid off Defendant Darren Fribence.[6]  While working for GrafTech, Fribence had installed ArchiTech software for customers and had access to the software's code.[7]  Several months after Fribence was laid off by Plaintiff GrafTech, Defendant SANGRAF hired Fribence as a salesperson.

In June 2014, Fribence was installing equipment for SANGRAF at a Gerdau plant in Jackson, Michigan that used electrodes purchased from both GrafTech and SANGRAF.[8]  He says that the customer asked Fribence if SANGRAF had monitoring software it could install because GrafTech's

---

[2]*Id.* at 10-11.
[3]*Id.* at 41.
[4]*Id.* at 45.
[5]*Id.* at 206.
[6]*Id.* at 29 (statement of Fribence's attorney).
[7]*Id.* at 78.
[8]*Id.* at 37, 79, 99.

Case No. 1:14-CV-02658
Gwin, J.

ArchiTech program was not functioning.[9/]  At this point, SANGRAF says that it was in the process

of developing Integraf, its own monitoring software, but that Integraf was not yet ready to be used.[10/]

When Gerdau asked Fribence for help, Fribence recalled that he inadvertently kept a copy

of ArchiTech on a personal thumb drive.  He recalled coming across that thumb drive while looking

for something else.[11/]  He retrieved this thumb drive, and installed ArchiTech at the plant.  While

doing so, he says he altered one page that previously displayed GrafTech's logo to display

SANGRAF's instead.[12/] Fribence's fix did not work.

Later, GrafTech personnel discovered the monitoring system at the Gerdau plant.[13/] GrafTech

discovered that the code Fribence had installed was a nearly identical copy of ArchiTech,[14/] which

is unsurprising since by Defendants' own admission, it was in fact a very slightly altered copy.[15/]

This instance of copying is not in dispute.  What is disputed is whether SANGRAF's Integraf

program violates GrafTech's copyright in its ArchiTech software.  SANGRAF says that it developed

Integraf independently of GrafTech's ArchiTech program.  GrafTech says that Integraf is nothing

more than a poorly disguised copy of its ArchiTech software.

Some evidence points in both directions.  Plaintiff GrafTech notes that the "independent

consultant" who designed Defendant SANGRAF's Integraf program was King Ingersoll,[16/] a former

---

[9/]*Id.* at 79.

[10/]*Id.* at 79, 82.

[11/]*Id.* at 96-97.

[12/]*Id.* at 113-14.

[13/]*Id.* at 68.

[14/]*Id.* at 130.

[15/]*Id.* at 113-14.

[16/]*Id.* at 200.

Case No. 1:14-CV-02658
Gwin, J.

GrafTech employee who had also helped develop ArchiTech.[17]  And GrafTech offered expert testimony from Ben Blake that Integraf was "substantially similar" to GrafTech's ArchiTech system.[18]  Blake relied heavily on the similarity of "data tags" between the ArchiTech and the Integraf systems.[19]

On the other hand, Defendant SANGRAF presented its own expert testimony from software expert Andrew Schulman that the programs were not structured in the same way.[20]  And with respect to the data tags, Schulman testified that the overlap with the newer SANGRAF was not complete, that the list of "data tags" was only a small subset of the data tags actually contained in the program, and that the overlap might be explained by reasons of compatibility or because there were the standard way to refer to those variables.[21]

On December 4, 2014, GrafTech filed suit against SANGRAF and Fribence, alleging copyright infringement, theft of trade secrets, conversion, breach of contract (against Fribence only), and tortious interference with contract (against SANGRAF only).[22]  On December 5, 2014, GrafTech filed a motion seeking a preliminary injunction forbidding SANGRAF from installing or using its Integraf software.  It rests this motion for a preliminary injunction "only on [SANGRAF's] infringement of GrafTech's copyrighted software."[23]  Both SANGRAF and Fribence have opposed

---

[17]/*Id.* at 60-61.
[18]/*Id.* at 141-42.
[19]/*Id.* at 141.
[20]/*Id.* at 169.
[21]/*Id.* at 186-89.
[22]/Doc. 1.
[23]/Doc. 6 at 3.

Case No. 1:14-CV-02658
Gwin, J.

this motion,[24/] and GrafTech has replied.[25/]

## II. Legal Standard

To obtain a preliminary injunction a "plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"[26/]  "A preliminary injunction is an extraordinary remedy never awarded as of right."[27/]

## III. Analysis

### A.    Success on the Merits

As noted above, there was testimony at the hearing pointing in each direction on this factor. On the one hand, between the admitted copying on one occasion, the use of one of the primary coders of ArchiTech as the primary designer of Integraf, and the testimony of Ben Blake, GrafTech's expert, there is certainly evidence to support a conclusion that Integraf is functionally a copy of ArchiTech.

On the other hand, not all elements of a software program are protected by copyright. Although certain elements of software programs are indisputably copyrightable, the idea/expression dichotomy and other doctrines such as merger and *scenes a faire* impose limits.[28/]  And expert testimony presented by Defendant SANGRAF suggested that the similarities identified by Plaintiff GrafTech's expert may have arisen from practical considerations such as compatibility that made the

---

[24/]Docs. 14 (SANGRAF), 15 (Fribence).

[25/]Doc. 17.

[26/]*Platt v. Board of Comm'rs on Grievances and Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Winter v. Natural Res. Defendant. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[27/]*Winter*, 555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

[28/]*See generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004).

Case No. 1:14-CV-02658
Gwin, J.

similarities necessary for a functional program.

Balancing these considerations, the Court concludes that this factor may tilt somewhat in favor of granting Plaintiff GrafTech a preliminary injunction.  Of course, this conclusion on a limited record in no way binds or controls the Court later in proceedings when the record is more developed.[29]

**B.      Irreparable Harm to Plaintiff**

Plaintiff GrafTech first argues that demonstrating a likelihood of success on a copyright claim is itself enough to show irreparable harm.  Indeed, that used to be the law in the Sixth Circuit.[30]  But that principle is no longer viable in light of *eBay Inc. v. MercExchange, L.L.C.*, where the Supreme Court rejected the near automatic grant of an injunction for a patent violation, in part by analogizing it to copyright cases.[31]  Although *eBay* deal with a permanent, rather than a preliminary, injunction, Plaintiff GrafTech has advanced no argument for why that distinction matters.  The Court will thus not presume irreparable harm and will instead conduct the traditional equitable inquiry.[32]

Second, GrafTech says that even if irreparable harm cannot be presumed, it shows a loss of goodwill and reputation that GrafTech will suffer if another competitor is allowed to use an

---

[29] 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2950 (3d ed.) ("[T]he court's findings of fact and conclusions of law with regard to the preliminary injunction are not binding at trial.  Based, as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered.").

[30] *Lexmark*, 387 F.3d at 532-33 (internal citations omitted).

[31] *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 392-94 (2006).

[32] Plaintiff cites two cases that postdate *eBay* and say that a rebuttable presumption of irreparable harm exists once a plaintiff shows a likelihood of success on a copyright claim.  *See Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853 (S.D. Ohio 2008); *Phelps v. MacConnell*, No. 3:12-cv-00344, 2013 WL 4010687 (N.D. Ohio Aug. 6, 2013).  Neither of these cases is persuasive.  In *Kendall*, the Court concluded that the presumption had been rebutted, and in *Phelps*, the Court concluded that there was no likelihood of success on the merits of the copyright claim, and that therefore the presumption of irreparable harm did not apply.  Moreover, both cases relied on precedent that preceded *eBay*, and neither case cited or considered the impact of *eBay*.

-6-

Case No. 1:14-CV-02658
Gwin, J.

infringing electric arc furnace monitoring program.  The Court is not persuaded.

In order to demonstrate irreparable harm, a plaintiff must show that money damages will not provide an adequate remedy.  Difficulty in calculating damages can, in some circumstances, make money damages inadequate.[33]  For that reason, the loss of goodwill can sometimes be an injury for which money damages are inadequate.[34]

In the present case, Plaintiff GrafTech has not demonstrated that it will suffer irreparable injury in the absence of a preliminary injunction.  The Court bases this conclusion on several factors.

First, representatives of both Plaintiff GrafTech and Defendant SANGRAF testified at the preliminary injunction hearing that the software was only one factor among many that customers consider when choosing a graphite electrode supplier.[35]  Price, not monitoring software, appears to be the most important factor influencing sales.[36]

Defendant SANGRAF's CEO likely exaggerated matters when he said that the ability to offer a monitoring system "doesn't have any impact on whether you win business or not."[37]  But other evidence supports the view that the monitoring system does not have the importance GrafTech attempts to attribute to it.

For one thing, GrafTech provides its ArchiTech software to only a minority of its own

---

[33]*Langley v. Prudential Mortg. Capital Co.*, 554 F.3d 647, 649 (6th Cir. 2009) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

[34]*Id.*

[35]Hr'g Tr. at 42 (GrafTech), 202-03 (SANGRAF).

[36]*Id.* at 49-50 (GrafTech's Director of Sales for the U.S. and Canada stating that he assumed Gerdau initially purchased from SANGRAF "on price").

[37]*Id.* at 203.

Case No. 1:14-CV-02658
Gwin, J.

customers.[38] And as illustrated by the presence of both GrafTech and SANGRAF electrodes at the

Gerdau plant, even those customers who do receive the software have no qualms about also

purchasing from other suppliers. GrafTech thus inadequately supports its claim that Integraf will

allow SANGRAF to gain a foothold with customers it would otherwise be unable to reach.

This conclusion is further bolstered by testimony as to certain aspects of purchasing practices

in the graphite electrode industry. In particular, the Court notes the testimony of Defendant Fribence

that steel companies would usually purchase from multiple suppliers because "[y]ou don't want to

put all your eggs in one basket."[39] Doing so, he explained, would leave them susceptible to having

to shut the plant down if the sole supplier had shipping or transportation issues.[40]

Furthermore, at least at Gerdau, and presumably at other large purchasers as well, the

electrode purchasing decisions are made centrally rather than by individual factories.[41] Although

representatives from the individual factories have input into this decision,[42] the fact that the decision

is ultimately made centrally also undercuts Plaintiff GrafTech's claim that an injunction is needed

to avoid irreparable injury. Centrally concentrated purchasing decisions could make it easier to

assess causation and quantify damages.

In short, Plaintiff GrafTech has alleged that if a preliminary injunction is not given,

SANGRAF (1) will gain meaningful goodwill (2) with customers it would not otherwise be able to

reach, and that (3) this will cause a loss of sales to GrafTech that will be so difficult to quantify that

---

[38]*Id.* at 45 ("I'm going to just guess and say that probably 30 percent of our customers, 40 percent have the ArchiTech system.").

[39]*Id.* at 103.

[40]*Id.*

[41]*Id.* at 50-51.

[42]*Id.* at 50.

Case No. 1:14-CV-02658
Gwin, J.

money damages will be insufficient.  Because GrafTech has not adequately established the links in

this chain, it has not shown irreparable harm.

**C.        Balance of the Equities and Public Interest**

In light of the Court's conclusion on the irreparable harm factor, an extended analysis of

these factors is unnecessary.  It suffices to say that neither overcomes the lack of irreparable harm.

**IV. Conclusion**

For the above reasons, Plaintiff GrafTech's motion for a preliminary injunction is

**DENIED**.

IT IS SO ORDERED.


Dated: February 4, 2015                              s/        *James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE